## Jones *v.* State

No. 40247 June 11, 1956 88 So. 2d 91

*John W. Barbee, F. C. Holmes, Jr., W. E. Wilroy, Boyce Lee Garner,* Hernando, for appellant.

*J. R. Griffin,* Asst. Atty. Gen., Jackson, for appellee.

ETHRIDGE, J.

Appellant, Willie D. Jones, was convicted in the Circuit Court of DeSoto County, for the murder of George Fritz, and sentenced to death.

I.

Fritz, a seventy-six year old, unmarried white man, operated a small grocery and general merchandise store and filling station near the Mississippi-Tennessee state line, in DeSoto County, Mississippi, on U. S. Highway 61. On the morning of April 1, 1955, he was killed by being struck on the head with some kind of blunt instrument, between the hours of 7 and 7:30 a.m. He lived in the back of the store. Mattie Evans lived one-half mile from the store, and went there that morning shortly after seven o'clock to get her newspaper. She discovered Fritz in the store slumped to his left and sitting in a rocking chair with his hat, glasses and newspaper on the floor. Blood was streaming from his body. He had been badly beaten and was unconscious. As Mattie was running out of the store to call for help, a neighbor, C. C. Mauldin, was approaching the store in his car. She told Mauldin what she had found, and after looking, Mauldin went for help. He returned with Guy Brown, another neighbor.

Brown testified that he first went to the store with an employee named Shelton around 7 a.m. that morning to get his newspaper, and that appellant Jones was there at that time sitting on a bench on the front porch. The store faced east and was located about fifty feet west of Highway 51 which runs north and south. Brown said that no one else was at the store, other than Fritz and Jones, when he went there at 7 a.m.; that Jones was carrying a small cloth sack, apparently made out of "duck-

ing'', but he did not know its contents. Brown stayed at the store about five minutes. While there, appellant asked Brown if he had any work for him to do as a tractor driver, and Brown replied he would see him when he was ready for some work. When he left about 7:05 a.m., only Fritz and appellant were at the store. Brown said that when he returned to the store with Mauldin, it was about 7:25 a.m., and appellant was not there. It had been discovered that Fritz had been badly beaten. Brown sent Fred Flinn, a Negro, to the Sanders house nearby where appellant was staying with his grandparents, to tell appellant that he wanted to see him, but he did not return with Flinn. ''The cash drawer and all was open'' in the store, and the cash drawer had been robbed. According to this witness, Fritz must have been killed between 7:05 and 7:25 a.m. However, Mauldin said that he went to the store at 7:30.

Fred Flinn lived near the Fritz store. He said that appellant had worked around that vicinity for five months, living with his grandparents, Enoch and Mary Alice Sanders, about one-half mile northwest of the store, just inside the Tennessee line. Flinn arrived at the store after 7:30 that morning, and Mauldin, Brown and Mattie Evans were already there. Pursuant to Brown's request, he went to the Sanders house to see appellant around 8 a.m. Jones was sitting in the kitchen eating. Flinn told him that Brown wanted him to come over to the store, to which Jones replied that ''Brown did not want to know anything about him. What did he want with him?'' Appellant never returned to the store.

M. A. Dowell, a bricklayer, had lived in the store with George Fritz eight to nine months. He said that he left to go to work that morning around five to ten minutes before 7 o'clock, and Fritz was then in the back room washing dishes. As he left, he noticed that Willie Jones was standing on the porch. He had been there for ten minutes. When appellant first arrived he came in the

store and warmed his hands by the stove. He did not notice anyone else. Appellant had on army coveralls with a deep pocket, and a paper bag in the left pocket was twisted around, but Dowell did not know its contents.

Dr. William W. Tribby, a pathologist at the Methodist Hospital in Memphis, Tennessee, where Fritz died on the afternoon of April 1, testified that he performed an autopsy on the body. The deceased had multiple injuries, including several fractures of the skull, multiple contusions of the brain, glandular hemorrhages, and lacerations of the face and scalp. Dr. Tribby said that the multiplicity of the wounds led him to the opinion that it was a blunt instrument which caused Fritz' death. Photographs of deceased were introduced in evidence. They reflected that he had received a terrible beating, with multiple blows around the head. Appellant's counsel asked Dr. Tribby whether the deep lacerations could have been made by Fritz' falling on a sharp object, and his answer was in the affirmative. However, this reply must be interpreted in its context. It would have been impossible for Fritz to have received the blows he did by a fall. Moreover, he was still in the rocking chair when he was found that morning. Dr. Tribby concluded that Fritz died directly from blows on the head.

Robin O. Cotten, a Special Agent of the Federal Bureau of Investigation, also testified for the State. He and two other agents arrested appellant in Memphis on the next afternoon, Saturday, April 2, 1955. He denied any connection with Fritz' death. On April 4, Monday, Cotten and two other agents, and Sheriff Elmore of DeSoto County, Mississippi, talked again with appellant, and he again denied that he was guilty. During this period, appellant was in the Shelby County, Tennessee jail in Memphis, being held on a federal charge of interstate flight to avoid prosecution for murder. On Thursday, April 7, appellant gave an oral and written confession that he killed Fritz.

There was a preliminary hearing on the issue of the admissibility of the confession, in the absence of the jury. The only witness who testified on this preliminary hearing was Cotten. He said that when appellant was interviewed on April 7 and the confession was given, he was present, along with Sheriff Elmore of DeSoto County, and John Carlisle, a Lieutenant of the Homicide Division, Sheriff's Office of Shelby County, Tennessee, and that Joel P. Walker, Jr., County Attorney of DeSoto County, were there part of the time. On the preliminary hearing, Cotten testified in detail that the confession was free and voluntary. He was cross-examined by one of the appellant's counsel. At the close of Cotten's testimony, appellant made a motion to exclude the confession on the ground that it was not free and voluntary. This motion was overruled. The three persons who signed as witnesses to the written confession were Cotten, Elmore and Carlisle. It is as follows:

> "Memphis, Tennessee
> "April 7, 1955

"I, Willie D. Jones, make the following free and voluntary statement to Robin O. Cotten, known to me as a Special Agent of the Federal Bureau of Investigation and to Sheriff Jack J. Elmore, DeSoto County, Mississippi, and to Deputy Sheriff John L. Carlisle, Shelby County, Tennessee. No threats or promises have been made to me to cause me to make this statement. I have been advised of my right to have a lawyer, and I have been told that anything I say may be used against me in a Court of law.

"I am 38 years of age and was born April 10, 1916, at Coldwater, Miss.

"I have finished 6 years in school.

"About 6:00 A. M. on Friday April 1, 1955 I left Memphis, Tennessee on the Greyhound bus and arrived

at Mr. George Fritz store on highway 61 at the Tennes-
see-Mississippi State line about 7:00 A. M.

"When I arrived at the store, Mr. Fritz was alone in
the store. I walked over to the meat box and looked in-
side and I wanted to buy some pok chops. Mr. Fritz
was sitting in a rocking chair near the drink box. He
was facing south. I reached in the drink box and took
out a double cola. I had already bought a rum crook
cigar from Mr. Fritz and I had paid him for the double
cola and the cigar.

"I kept standing in front of the meat box and I be-
lieve it was about 3 minutes.

"Mr. Fritz was still sitting in the rocking chair and
he looked around at me and asked me what I was stand-
ing up there waiting on. I told him I was looking in
the meat box and he said 'you ought to be done made up
your damn mind by now.' He also said 'get the hell on
out of here.' When Mr. Fritz said this, I was standing
about 2 or 3 steps to the right of him. I was close to
the meat box then. It made me mad when Mr. Fritz told
me to get out and I had the double cola in my hand and
then I turned the bottle over and grabbed the neck of the
bottle in my right hand and stepped behind Mr. Fritz
and hit him on the side of the head. I drew back and hit
him again somewhere on the head. I hit him once or
twice again on the head and left out the front door. Just
before I left, I grabbed 3 or 4 cigars and put them in
my pants pocket. I did not put my hands on Mr. Fritz
and when I left the store, he was still sitting in the chair.
I went up a gravel road just north of Mr. Fritz store and
about 100 yards from the store, I crossed a wire fence
and threw the bottle in a thicket.

"I would also like to state that before I hit Mr. Fritz
I saw Mr. Guy Brown in the store, and I also saw a
white man and a colored man I did not know. These
two men heard Mr. Fritz tell me 'you ought to be done

made up your damn mind by now.' These persons are the only ones I saw in the store on this morning.

"After I had thrown the bottle away, I went home and washed my hands and face and ate breakfast. While I was eating breakfast, Fred Flinn came to my house and said Mr. Guy Brown wanted to see me. I had asked Mr. Brown for a job at the store just before I hit Mr. Fritz.

"I then pulled off my coveralls and put my overshoes on and walked to the highway and caught a ride towards Memphis. The man was colored and was driving a red pickup truck, loaded with scrap iron. I rode with him to Peeples Avenue in Shelby County and then I walked to my cousin's house at 3024 Parker where I was later arrested.

"I have read the page at Four page and it is true."

The confession consisted of four pages written in longhand by Cotten pursuant to what Jones told him. It was signed at the bottom of each page and at the end of the instrument by Jones, and witnessed by Cotten, Elmore and Carlisle. The officers promptly went to DeSoto County to try to find the bottle which the above-quoted confession of Jones states he used. They could not find it, and on the next day they interrogated appellant about it. He admitted that he had told them falsely about the bottle, and said that he used an iron pipe on Fritz. The officers found an iron pipe near the front doorstep of Jones' home, but Jones told them that he did not use it. He then made a further oral statement as to the instrument he used on Fritz, describing it as an iron railroad nut about three inches across, on a stick about eighteen inches long, which is often called a "rabbit or tap stick." Appellant told the officers it was wrapped in a paper sack, and that he had thrown it in the women's toilet to the rear of the Fritz store. Immediately afterwards, officers went to this toilet and found this described instrument in a paper sack where appellant had told them he threw it. Cotten said that during the interrogation

of appellant prior to his confession, Joel Walker, Jr., County Attorney of DeSoto County, was "in and out", and that DeSoto County Deputy Sheriff Garner was there "a part of the time."

John L. Carlisle is a Lieutenant in the Homicide Division, Sheriff's Office of Shelby County, Tennessee. He went to the Fritz store that morning, took photographs, and assisted in the investigation. He said that on the morning of April 7, Cotten, Sheriff Elmore, and he interviewed appellant on the fifth floor of the city jail in Memphis; that District Attorney Chatham was in and out of the office on several occasions; and that the confession was free and voluntary. He also told about appellant changing his version from the use of a soft drink bottle to an iron pipe to a "rabbit stick". He and other officers found the instrument in a paper bag in the women's toilet at the Fritz store, where appellant said he put it.

On the morning Fritz was killed, Carlisle went to the Sanders home, where defendant lived. About thirty feet inside the gate, he found three Melba cigars lying in the path. It was raining very hard that morning, but the cellophane on them was in good shape. The brand was the same kind which was in an open box on the counter in the Fritz store, from which some cigars had been removed. Carlisle testified that he did not question appellant at any time other than when Cotten and Elmore were present. County officers do not question federal prisoners unless the F. B. I. has them on its wanted list. None of the interrogations were over an hour and a half to two hours. Appellant's written statement was made at the F. B. I. office. Cotten read it to the defendant, following which defendant signed it and initialed some corrections. Carlisle said that he did not hear Sheriff Elmore make any statement promising the defendant anything; and that no officers from DeSoto County made

any statements to Jones that they would be light on him if he made a confession.

Enoch Sanders testified for defendant, his grandson, who had been living with him since the preceding November. Defendant did not spend the night before Fritz was killed at his house, but arrived there about 7:05 a.m. He did not seem to be upset. Defendant removed his coveralls and put on some other clothing. Ten to fifteen minutes after Fred Flinn left, defendant departed. Defendant smokes cigars, but the witness does not. Mary Alice Sanders testified substantially to the same effect as her husband. She saw some man pick up the cigars in their yard. Flinn told appellant that Brown wanted him to drive a tractor, and appellant said that he would go and see Brown.

Defendant Jones testified that he spent Thursday night in Memphis at a bus station, and left by bus around 6 a.m. He got off at Fritz' store and bought a cigar and a soft drink. Fritz was there. He admitted talking to Guy Brown about a job, and said he left the store about the same time as Brown; that he went up the hill toward the Sanders house, and at a distance saw a Ford truck containing a white man and two Negroes. One of them got out, but he observed nothing more. He denied that he assaulted Fritz, and said he was all right when he left the store. He did not go back to see Brown, because he had just talked with him, but he told Flinn that he would see Brown on Saturday or Monday. He left the Sanders house about thirty minutes after Flinn, and caught a truck on the highway toward Memphis. He was staying at his cousin's about ten miles from the Fritz store when the F. B. I. arrested him. He had $7 in a shoe, and $1.83 in his pocket, which he had earned several days before.

When Elmore and Cotten interrogated him on Monday, Jones denied he was guilty. About three days later Cotten, Elmore and two more officers interrogated him

for about two hours, and he again denied being guilty. On the next day, appellant said that several unknown officers, without Cotten, took him to a room in the jail and threatened him with a hose and blackjack, but he dodged the licks; that two days later, Cotten, Elmore and several other men examined him, and Elmore told him he would make it light on him if he confessed. Appellant admitted signing the written confession, but said that he did so because he was told that where he put his initials, the text was wrong. He said the entire instrument was false.

On cross-examination appellant admitted that when he was at the store he had a paper sack in his pocket, which he said contained a luminous, chromium walking stick which he later sold. Appellant stated that on one occasion, in the presence of two other officers, identity unknown, Cotten drew back his open hand and threatened to hit him but never did. He said that on three occasions some unknown officers questioned him and hit at him with a hose and blackjack in the city jail; that nobody ever hit or threatened him in the presence of Carlisle or Sheriff Elmore; and that Cotten threatened him only once. Cotten, Elmore and Carlisle were present when he signed the confession, but none of them threatened him before he signed it. He admitted the confession was read to him. He said he signed it after "they whipped me," referring to unknown persons, before Carlisle, Elmore and Cotten interviewed him. He admitted that he told the officers he had lied about the bottle and stated he used and iron bar; and that he later told them he had lied about that, but had used a "rabbit stick," without a top on it. Significantly, Jones admitted he told the officers that it was a walking stick wrapped in a sack which he had dropped in the toilet behind the store, and if they would go there they would find it.

On rebuttal for the State, Cotten denied that he had ever threatened appellant in any way. He said that no person to his knowledge struck defendant, or mistreated

or threatened him. Upon being asked whether Elmore made the statement to defendant that he would get off light, Cotten said that he knew of no such promise, and he was present with Elmore on the occasions they interviewed him. Cotten of course denied appellant's statement concerning the meaning of his initials on the confession. He was asked whether appellant could have been interviewed without his knowledge. He said, "I don't think so. It is not customary." He had no knowledge of any other interrogations.

## II.

 From the foregoing analysis of the testimony, it is manifest that there was ample evidence to support the jury's verdict of guilty. Appellant argues that the corpus delicti was not sufficiently proven to admit the confessions. The corpus delicti in a homicide case consists of the fact of death and the fact of the existence of a criminal agency causing the death. A leading case on this point is Phillips v. State, 196 Miss. 194, 16 So. 2d 630 (1944). In Buford v. State, 219 Miss. 683, 690, 69 So. 2d 826 (1954), it was said: "We recognize the well settled rule that a confession of the accused is not alone sufficient to prove the corpus delicti. There are other rules, however, which are equally well settled with respect to the requirements for proof of the corpus delicti. Where there has been a confession by the accused, much slighter evidence is required to establish the corpus delicti than would be necessary where the state must make out its entire case unaided by such confession. . . . The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt. . . . Where there has been a confession by the accused, any corroborative evidence will be held sufficient which satisfies the mind that there is a real and not an imaginary crime to which

the accused has confessed. .... Although the corpus delicti cannot be proved alone by the accused's confession, his criminal agency may be shown by his own confession." See also Gilmore v. State, 82 So. 2d 838 (Miss. 1955); Simmons v. State, 208 Miss. 523, 44 So. 2d 857 (1950); Daniel v. State, 212 Miss. 223, 54 So. 2d 272 (1951); Gatlin v. State, 219 Miss. 167, 68 So. 2d 291 (1953).

 █ In the present case, the evidence justified the jury in finding that Fritz was killed by a criminal agency, and in further finding that appellant was the one who murdered him. Two witnesses, Brown and Dowell, placed appellant at the store ten to fifteen minutes before George Fritz was killed. Appellant admitted that he was there until five minutes after seven. Fritz was killed between that time and 7:25 or 7:30. According to Dr. Tribby's testimony, that of other witnesses, and the photographs in evidence, the cause of Fritz' death was multiple blows to the head with a blunt instrument. It had to be wielded by a person. It was impossible for wounds of the type received to have resulted from a fall. Moreover, Fritz was sitting in a rocking chair when found. The cash drawer was open, and the jury could have found that it had been burglarized. All of this evidence warranted the jury in finding the existence of a corpus delicti, and was an ample predicate for admission of the confessions into evidence.

 █ Of course the defendant's criminal agency may be shown by his own confession. In addition, the jury could properly consider other facts. Defendant told the officers that he had beaten Fritz with a stick containing an iron nut on the end of it, it was wrapped in a paper sack, and he had dumped it in the women's toilet at the rear of the store. The officers found it exactly where defendant told them it was. Defendant's confession stated that he had picked up some cigars from the counter of the store. Cigars in cellophane wrappers were found on the path in the Sanders yard by Carlisle around 9:45

a.m. It had been raining but the cellophane was in good condition; and some cigars of this same brand had been removed from the counter of the store. The jury could also consider defendant's peculiar behaviour after Flinn brought him a message from Brown that he wanted to see him. Furthermore, defendant admitted that he told the officers he had put a "walking stick" in a sack under the women's toilet to the rear of the Fritz store. All of these circumstances considered as a whole, together with appellant's written confession and oral statements, amply warranted the verdict of the jury.

Appellant contends that it was error for the district attorney on direct examination of Dr. Tribby to have asked him whether an instrument such as the "rabbit stick", exhibiting it, could have caused the wounds on Fritz, to which the doctor replied in the affirmative. However, no objection was made to this, and the instrument was later introduced into evidence. Appellant's confession reflects that his motive for killing Fritz was anger at what Fritz said to him. Other evidence indicates that the cash drawer was burglarized. The jury could accept or reject either. As to motive, it was said in Swanson v. State, 218 Miss. 103, 107, 65 So. 2d 232 (1950): ██ █ "Proof of the motivating cause for a crime is of great benefit in establishing the guilt of the accused. Sometimes, however, it is impossible to produce proof of the killer's reason for so doing. But nowhere in our jurisprudence is found a basis for the acquittal of a killer merely because the State is unable to point out, by proof, the particular reason which the accused had for the killing of his fellow-man."

██ █ The questions to appellant concerning his prior convictions were proper under Code 1942, Section 1693, and Smith v. State, 217 Miss. 123, 63 So. 2d 557 (1952). ██ █ And the testimony of Cotten on rebuttal for the State was entirely proper as rebutting the evidence for defendant.

## III.

Nor was there error in the admission of the confession into evidence. On the preliminary hearing, the only witness who testified was Cotten, and he proved that the confession was free and voluntary. Appellant offered no evidence to contradict Cotten's testimony, so the trial judge properly found that the confession was voluntary and competent evidence and overruled defendant's motion to exclude it. In the presentation of defendant's case in chief, defendant testified, as outlined above, that his confession was false, and that some unknown officers in the county jail at Memphis had threatened him and prior to his confession had beaten him. He admitted that none of the witnesses to his confession, being Cotten, Elmore and Carlisle, had done these things, although he said Cotten threatened him on one occasion. On the other hand, both Cotten and Carlisle testified for the State's case in chief about their interrogations of appellant, and said that what he did was entirely voluntary and free of any coercion. Their testimony has been outlined above. And on rebuttal, Cotten again denied appellant's testimony that he was coerced. He and Carlisle both testified that Sheriff Elmore made no promises in their presence to appellant, and that they were with Elmore on the occasions that the sheriff interrogated appellant. It was agreed that Sheriff Elmore was ill at the time of the trial and was unable to attend. At no time subsequent to the preliminary hearing did appellant make any motion to exclude the confession. The trial court gave defendant several instructions submitting to the jury the question of whether defendant's confession was free and voluntary, and instructing the jury that, if it found it was not voluntary, it must disregard the confessions.

In Loftin v. State, 150 Miss. 228, 116 So. 435 (1928), it was held that where a defendant in a prosecution for murder offered no evidence on preliminary examination

relative to whether his confession was free and voluntary, and, after offering testimony on the merits tending to show the confession was made under coercion, made no motion to exclude it, the failure of the trial court to exclude this evidence of its own motion was not error. In other words, after the preliminary hearing the trial court was not called upon again to pass upon the competency of the confession. The Loftin case was cited with approval in McDowell v. State, 189 Miss. 617, 198 So. 564 (1940); and Holmes v. State, 211 Miss. 436, 51 So. 2d 755 (1951), on second appeal in 56 So. 2d 815 (1952) (distinguishing Loftin). This is one reason why the trial court was not in error in failing to exclude the confession after hearing all of the evidence.

 Another equally valid reason is this: Where an apparently competent confession has been admitted, and it is afterwards made to appear *without dispute* that said confession was not freely and voluntarily made, it is the duty of the court of its own motion to exclude the confession. However, this duty is not an absolute one where the testimony bearing upon the admissibility of a confession is conflicting, as in the present·case. The established rule is stated in Wohner v. State, 175 Miss. 428, 167 So. 622 (1936): "It has been the long-established rule in this state that it is the exclusive province of the trial judge to pass upon conflicts in the evidence bearing upon the competency and admissibility of confessions, and that his rulings thereon will not be reversed unless clearly contrary to the weight of the evidence. . . . . In the case at bar the evidence abundantly supports the view that the confessions were freely and voluntarily made, and, this being true, we cannot say that the court below was in error in failing, of its own motion, to exclude them. It is not the rule, and we assume it never will be the rule, that the mere fact that a defendant produces testimony tending to prove that his confessions were· coerced renders them incompetent, although the

evidence on the point is conflicting. ■■ In such cases the trial court must determine the issue presented by the conflicting evidence, and, where its decision is fully supported by the evidence, it will not be reversed.''

These quoted principles are pertinent here. After the preliminary hearing defendant's testimony raised an issue of fact as to whether his confession was free and voluntary. It was the duty of the trial judge to pass upon these conflicts bearing upon the competency and admissibility of appellant's confession. ■■ His implied ruling that it was competent was supported by substantial evidence. We certainly cannot say that it was manifest error for the trial court to fail on his own motion to exclude the confession.

■■ Moreover, the rebuttal testimony for the State as to the confession, when considered as an entirety, does not fall within the deficiencies condemned in Holmes v. State, supra. In the Holmes case, it was pointed out that the situation there was different from Loftin, in that in the latter no motion was made to exclude the confession after the defendant had testified, while in Holmes such motion was made. Sheriff Elmore was unable to testify because of illness. As a precautionary matter, the State perhaps should have offered rebuttal testimony by County Attorney Walker and Deputy Sheriff Garner, although the record reflects that they were ''in and out'' of the interrogation room at irregular intervals. However, for these reasons these omissions were not error, in view of the stated rules in the Loftin and Wohner cases. Cotten and Carlisle fully contradicted defendant about the circumstances attending the confession. As to the unknown officers in the Shelby County jail building in Memphis, who defendant alleges beat him, we do not think that the rule in Holmes v. State can be extended to require the State to offer as rebuttal witnesses all of the probable several dozen of hundred officers who occupy that building as headquarters.

476

Affirmed, and Friday, July 13, 1956, is set for execution of the death sentence.

All justices concur except *Holmes, J.,* who took no part.