360 So.2d 1206 (1978)
Charles S. BELL
v.
STATE of Mississippi.
No. 50382.
Supreme Court of Mississippi.
May 24, 1978.
Rehearing Denied August 9, 1978.
*1207 Paul Richard Lambert, Hattiesburg, for appellant.
A.F. Summer, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
WALKER, Justice, for the Court:
This is an appeal from the Circuit Court of Forrest County, Mississippi. Charles S. Bell was indicted for the capital murder of Danny C. Haden pursuant to Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1977). He was afforded a bifurcated trial under the standards announced by this Court in Jackson v. State, 337 So.2d 1242 (Miss. 1976), conforming to the opinions in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. *1208 2909, 49 L.Ed.2d 859 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). At the conclusion of the guilt phase, the jury returned a verdict of guilty. Thereafter, a separate hearing was conducted on the issue of sentence by the same jury. After deliberation, the jury returned with a written verdict signed by all jurors stating that:
We the jury, unanimously find that after weighting [sic] the mitigating circumstance and the aggravating circumstance, one against the other, that the mitigating circumstances do not outweight [sic] the aggravating circumstances, and that the defendant should suffer the penalty of death.
The facts of this case are uncontradicted except for the question of who actually pulled the trigger. Both the defendant, Bell, and his former codefendant, Posey, agreed in their testimony at trial as to what transpired until the very moment the actual shooting took place.
On the night of June 21, 1976, or morning of June 22, 1976, Charles Bell, Bobby McFarland, Caesar Posey and Luther York drove into an Amoco service station in Hattiesburg, Mississippi to purchase gas. Shortly after leaving, McFarland brought up the idea of robbing the service station. All agreed, and armed with three shotguns and one .22 rifle, they returned to the station.
Upon the approach of the attendant, McFarland held a shotgun up to the window and relieved the attendant of his money. He then ordered the attendant to get into the car. While driving in the car, the attendant was searched and relieved of other personal items by Bell and York. After passing through the small town of Petal, Mississippi, McFarland, then driver of the car, stopped it in a wooded area and ordered the attendant, Danny Haden to get out.
Thereafter, Bell, McFarland and York took the victim into the woods. Posey remained in the car. After traveling a short distance into the woods, the victim was summarily executed, suffering a shotgun blast to the neck which decapitated him, and a blast from another shotgun in the back.
It is uncontradicted that all three participants in the final execution were armed when they left the car and when they returned. There is, however, a conflict in testimony as to who was armed with what and who actually fired the shots that murdered the victim.
Posey, who remained in the car, testified that throughout, Bell and McFarland were armed with shotguns while York was armed with a .22 rifle. He further testified that upon returning to the car, Bell told him that McFarland had shot the victim in the neck and he (Bell) had shot the victim in the back. This was corroborated by the testimony of another witness, Aubrey Wayne Evans, a cell mate of Bell's while Bell was held pending trial. Evans testified that in a conversation Bell said in reference to the service station attendant, "We shot him," and, "As he fell I [Bell] shot him again." Bell testified that he saw McFarland "blow his head off," but alleged that York fired the shot to the back.

I.

THE INDICTMENT
Bell alleges the failure of the court to grant his motion to quash the indictment was error. His contention is based upon the argument that the indictment was fatally defective because it did not specifically and particularly describe and define the offenses charged therein.
Although Mississippi Code Annotated section 99-7-21 (1972) requires objection to an indictment with error appearing on its face to be raised by demurrer to the indictment, nevertheless, defendant's argument also fails on substantive grounds. Mississippi Code Annotated section 99-17-20 (Supp. 1977) requires that an indictment charging *1209 capital murder specifically cite the section and subsection of the Code relied on to constitute the offense. The indictment, as amended, charged:
[T]hat Charles Sylvester Bell and Caesar Posey, in conjunction with each other, on the 22nd day of June, 1976, in Forrest County aforesaid: did unlawfully, willfully and feloniously, with malice aforethought, kill and murder one D.C. Haden, a human being, while engaged in the commission of the crimes of armed robbery and kidnapping upon him, in violation of Section 97-3-19(2)(e) (See appendix) of the Mississippi Code of 1972, as Amended, against the peace and dignity of the State of Mississippi.
In Bell v. State, 353 So.2d 1141 (Miss. 1977), we considered an indictment containing virtually identical wording and upheld it. As we pointed out then, the statutory language adequately defines the offense. Here, the indictment as written was sufficient to give the defendant fair notice of the crime charged in clear and intelligible language. Varnado v. State, 338 So.2d 1239 (Miss. 1976); Westmoreland v. State, 246 So.2d 487 (Miss. 1971).

II.

THE PETITION FOR PSYCHIATRIC EXAMINATION
Defendant argues the court's refusal to have him committed for psychiatric examination prior to trial was reversible error. Mississippi Code Annotated section 99-13-11 (1972) states that the trial judge may order a mental examination, where "... the mental condition of a person indicted for a felony is in question..." In McLeod v. State, 229 So.2d 557 (Miss. 1969), where the Court construed Mississippi Code of 1942 Annotated section 2575.5 (Supp. 1968), which is identical to the present section 99-13-11, we stated:
It is the purpose of this statute to assure that a defendant is mentally capable of standing trial and is able to confer intelligently with his attorney in the preparation of his defense. Evidence of the probability that the accused is unable to assist in his own defense must be presented. (Citation omitted). The trial judge has reasonable discretion in determining whether the accused should be examined by a psychiatrist. (Citation omitted). (229 So.2d at 559).
At the hearing on Bell's petition for a psychiatric examination, the only evidence offered by petitioner was his own testimony. Bell testified that he "had been having problems with my head lately" and that he had headaches for the past five or six months. On the other hand, he testified that he was able to and had cooperated with his attorney in preparation for trial, and that he did not think he was "crazy" or a "psychopath." On this evidence, it cannot be said the trial judge was incorrect in denying a psychiatric examination.

III.

THE MOTION TO SUPPRESS THE STATEMENT OF THE DEFENDANT
Prior to trial the defendant made a motion to suppress a statement given to investigators while he was incarcerated pending a trial on other charges. The grounds for suppression were that the statement given was in violation of the Fourth and Fifth Amendment rights to counsel and the privilege against self-incrimination. After a hearing, the trial judge denied the motion.
Specifically, Bell contended that his written statement (1) was not voluntarily given; (2) was given in the absence of effective Miranda warnings and without an effective waiver; and (3) was not substantially recorded in the words he used.
The statement in question was given by Bell on January 15, 1977. This was the same day the body of Danny Haden was located, after having been missing for some six or seven months. The statement in its entirety was subsequently introduced into evidence. The statement was preceded by a written waiver of Fourth and Fifth Amendment rights and was essentially *1210 identical to defendant's testimony at trial, except that in the statement he denied having gone into the woods with the victim and McFarland.
At the pre-trial suppression hearing, Detective Sergeant Gerald Rice of the Hattiesburg Police Department testified that he was present when the statement was made, and that it was freely and voluntarily given without coercion or promises on the part of the law enforcement officials. The statement itself was introduced into evidence. The statement was preceded by a written waiver of rights signed by Bell and witnessed by Arlon Moulds and Gerald Rice as was the statement.
During the hearing, Bell, on cross-examination, testified himself that (1) he signed the statement; (2) he understood his rights at the time; (3) the persons present did not physically abuse him, nor coerce him, nor promise any reward; and (4) he gave and signed the statement freely and voluntarily.
Based on his own testimony, there can be no doubt that the statement as given was given voluntarily and with full knowledge of his rights at that time.
Bell also contended at the pre-trial hearing that the statement was not couched in his language, but in that of the investigating officers. The only evidence presented at the hearing on that issue was the testimony of the defendant. He testified that he did not use the word "Hercules" in his statement and that he did not know where the City of Laurel was located. Within the statement was the sentence, "So they changed places again and Bobby drove past the Hercules going like to town ..." Another sentence stated "then Bobby drove on up through Laurel and later we came back to Hattiesburg."
In the first instance, neither word is material to the content of the statement, nor would they vary the meaning of the statement. In the second instance, Arlon Moulds who witnessed the statement testified that he furnished the name of the plant and street names from his knowledge of the area, as Bell described each location. We cannot say from the record that the changes were substantial or significant enough to justify suppression of the statement.
The final contention of defendant is that the statement should be suppressed based upon an alleged earlier violation of his constitutional rights. At the hearing, Bell testified that approximately one month and a half prior to his statement (e.g., December 2, 1976), he was beaten and coerced by police officers in an attempt to get him to show the officers the location of the body of Danny Haden. According to Bell, on the night of December 2 there was an attempted jail break and in the course of that, Bell was taken to the second floor of the jail complex where he was assaulted by some nine or ten police officers. According to him, one of them asked where the body was. Subsequently, according to Bell, the officers took him out in search of the body in the early morning of December 3 and that both he and Caesar Posey were threatened that the officers would kill them if they did not give the location of the body. According to Bell, three more trips were made, two on December 3 and on December 4. However, no statement was given by Bell or Posey at that time.
In rebuttal, the state put on Detective Sergeant Rice, Deputy Sheriff Joe Hopstein, Investigator Arlon Moulds, Deputy Sheriff Frank Evans and Deputy Sheriff William Martin. Deputy Sheriff Hopstein as well as Deputy Sheriff Evans testified that Bell went on the search freely and voluntarily. Each denied any knowledge of physical abuse or threats.
In the first instance, based on the conflicting testimony as to the occurrences, we are unable to say the trial judge was wrong in finding there were no abuses. Additionally, no "statements" were made or sought to be introduced by the state as to these events. On the contrary, all references to these events at the trial on the merits were raised by the defendant himself.
Appellant attempts to argue that the holding of the Supreme Court in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 *1211 L.Ed.2d 424 (1977) mandates suppression of the statement. This argument fails for two reasons:
(1) Unlike in Brewer, the "interrogation" produced neither an incriminating statement which the state sought to introduce at trial nor did it produce the body of the deceased; and
(2) Here the statement which was introduced at trial was given some one and one-half months later and was a product of defendant's express knowing, intelligent and voluntary waiver of his rights.

IV.

APPLICATION OF THE CAPITAL MURDER STATUTE AS CONSTRUED BY THE CASE OF JACKSON V. STATE.[1]
The murder of Danny Haden occurred on June 22, 1976. At that time the capital murder statute in force was Mississippi Code Annotated section 97-3-19(2) (Supp. 1977) and the death penalty statute was Mississippi Code Annotated section 97-3-21 (Supp. 1977). In October 1976, prior to the apprehension and trial of Bell, this Court construed the Mississippi statutes in the light of the United States Supreme Court decisions on the death penalty. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The Court at that time also prescribed the rules of procedure to be applied in capital murder cases. Jackson v. State, 337 So.2d 1242 (Miss. 1976).
Under the rule of Jackson in a capital murder case, the following procedure was prescribed:

AT TRIAL
(1) A bifurcated trial with a guilt phase and a sentencing phase;
(2) Consideration of mitigating and aggravating circumstances at the sentencing phase and a weighing of each, and of each against each other; and
(3) If the sentence is death, there must be a unanimous finding in writing by the jury that, after weighing the mitigating and aggravating circumstances, one against the other, the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.

ON APPEAL
(1) Automatic review as a preference case;
(2) Review of the aggravating and mitigating circumstances to determine whether the punishment of death is too great when the two are weighed against each other; and
(3) Comparison to similar cases to insure that the death sentence is not inflicted in a wanton or freakish manner but in a consistent and even-handed manner.
In the present case defendant Bell received a bifurcated trial. At the conclusion of the guilt phase, the jury returned a verdict of guilty as charged. Examination of the testimony reveals that Bell himself, while testifying, admitted to all of the elements of the crime of capital murder, denying only that he actually pulled the trigger. Other testimony before the jury was sufficient for them to find as a matter of fact that Bell actually pulled the trigger. There can be no doubt as to the findings of guilt in the present case beyond a reasonable doubt.
After the guilty verdict, the same jury was empanelled to hear circumstances in mitigation or aggravation and to pronounce *1212 the sentence. The state moved to reintroduce all evidence admitted at the guilt phase into the sentencing phase and introduced the prior convictions of Bell. The defendant then moved to reaffirm the testimony of the defendant. At that time both the state and defendant declined to put on further witnesses when given the opportunity to do so. Final argument on sentencing was made by both the state and the defendant. The jury then returned the death penalty in written form.
Upon appeal the case was granted preference status. Oral arguments were heard by the Court en banc rather than by the usual three-judge panel. The Court fully considered the mitigating versus the aggravating factors and compared the case with similar cases in the following manner.

A.

MITIGATING VERSUS AGGRAVATING FACTORS

(1) Mitigating factors.
We held in Jackson v. State that at the sentencing hearing "the defendant may introduce competent evidence relevant to determination of his punishment, even though such evidence might not have been admissible on the question of guilt," and that "[h]e may prove his lack of a prior criminal record and may introduce such other evidence of his character or the particular circumstance of his crime that would be relevant in deciding whether he should be sentenced to death or life imprisonment." (337 So.2d at 1254). By incorporating the defendant's trial testimony into the sentencing portion, the following circumstances in mitigation were before the jury.
(1) On the night of the murder, Bell had been taking marijuana and other drugs; and
(2) According to Bell's testimony, he was an accomplice only and asked McFarland not to kill the victim. That he had asked McFarland not to kill the victim at one time was corroborated by Bell's codefendant, Posey.
While not before the jury, we, as an appellate court, under our own duty to weigh the mitigating factors take note that the record reveals in addition the mitigating circumstance that Bell was either seventeen or eighteen years old[2] when the crime was committed and twenty years old at the time of trial. We also take note that included in the record is the defendant's motion for a psychiatric examination and we note the evidence put forth on that motion though the motion was correctly denied.

(2) Aggravating circumstances.
In Jackson, we pointed out that although Mississippi had not adopted a list of statutory aggravating circumstances, its action in narrowing the categories where capital punishment may be imposed serves the same purpose. Jackson at 1254; See also Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). We went on to hold that "In essence, the Mississippi statutes require that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed." In that case we pointed out that the statutory aggravating circumstance was that of murder while attempting rape, Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1977). In the present case, the jury had been previously instructed at the guilt phase:
... if you believe from the evidence presented in this case beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, that the defendant Charles Sylvester Bell in Forrest County, Mississippi on the 22nd day of June, 1976, wilfully, unlawfully and feloniously and of malice aforethought kill and murder Danny Haden, a human being, while in the commission of the crime of armed *1213 robbery and kidnapping then it is your sworn duty to find the defendant guilty as charged.
In another instruction the jury was instructed that defendant was charged with the crime of capital murder for having caused death while committing armed robbery or kidnapping. The instruction went on to state, "If you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence that the defendant was engaged in the criminal act of armed robbery or kidnapping, then you shall find the accused guilty of capital murder."
The jury found that the defendant had committed the murder and that it occurred during the acts of armed robbery and kidnapping. In the sentencing hearing, the record submitted to the jury showed by the defendant's own admitted testimony that he had participated in the armed robbery, kidnapping and murder of Danny Haden. Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1977) which, under Jackson, lists statutory aggravating circumstances, provides that killing of a human being shall be capital murder "[w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of ... kidnapping ... or robbery ..." Based upon the evidence before the sentencing jury, they did and justifiably so, conclude the presence of this statutory aggravating circumstance.
Balancing the mitigating factors before the jury against the aggravating factors before the jury, we cannot say the jury was erroneous in its conclusion. The jury was fully aware of Bell's denial that he actually shot the victim and aware of his testimony that he had asked McFarland not to shoot the victim at one time. They also had before them the testimony relating to the use of drugs prior to the execution. However, in balancing this against Bell's clear and voluntary participation in armed robbery, kidnapping and the execution style murder, the jury concluded the death sentence was required. We cannot say the jury was incorrect but rather they were more than justifiably correct.
Nevertheless in our duty on review as specified in Jackson, we here review all mitigating and aggravating factors which appear in the record whether submitted to the jury or not. We have heretofore noted the age of the defendant and the evidence going to his request for psychiatric examination. On the other hand, we note this young defendant's long line of convictions involving crimes of violence, e.g., two convictions of robbery with a deadly weapon, burglary in the second degree, assault with intent to kill, and a prior conviction of capital murder for which he received life imprisonment. We note that the murder occurred in the commission of a crime for pecuniary gain and that the execution type murder itself was especially heinous, atrocious and cruel, involving mental torture of the victim. Moreover, the defendant, in his own testimony, showed little, if any, remorse.
The defendant himself testified that he participated in the armed robbery, voluntarily and without objection, that he assisted in the kidnapping of the young victim, searching his pockets while the terrified victim sat beside him in the car. He then voluntarily, and armed with a weapon, accompanied the victim and two co-conspirators to the execution site in the woods. There, Bell, in his own version, without taking any preventive action watched as "they blowed his head off," and, "his head fell off, his head came off." When asked if the victim had a chance to defend himself, Bell replied: "No, sir, he didn't." Upon being asked if he had lost any sleep over it, Bell replied, "No, sir," and "But, I didn't lose no sleep over it." Again, upon being asked, "The fact of the matter is you didn't feel too sorry about it at all, do you Mr. Bell," the reply was, "No, sir." Other testimony, of course, by co-defendant was that Bell himself actually fired the second shot into the victim's back as he was falling down from the decapitating blast.
Under these circumstances, we cannot say the jury was incorrect in its conclusion *1214 as to the verdict of death even considering and giving full weight and significance to every possible mitigating factor revealed in the record on both the guilt phase and the sentencing phase.

B.

COMPARISON WITH SIMILAR CASES
In Jackson v. State, we pointed out that the decisions of the Supreme Court clearly impose a requirement of appellate review to insure that the death penalty is not applied wantonly but rather in an even-handed manner. We went on in that case to require comparison with similar cases but without giving specifics as to the nature of such comparison.
A survey of Mississippi cases reveals that the last capital punishment effected in Mississippi occurred on May 1, 1964. That case, Jackson v. State, 249 Miss. 202, 161 So.2d 660 (1964) was decided on March 16, 1964. The records on executions actually carried out were centralized at the state penitentiary and commenced with March 3, 1955. During that nine-year span, there were thirty-one executions in Mississippi. Of that number, eight were for the crime of rape of an adult. The United States Supreme Court in Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) in a plurality opinion ruled that the death penalty in such a case was excessive since grossly disproportionate to the offense.
Two other cases involved rape, e.g., Young v. State, 239 Miss. 369, 123 So.2d 311 (1960) [rape of a seven-year old]; Jackson v. State, 249 Miss. 202, 161 So.2d 660 (1964) [murder and rape of eight-year old]. One case involved the imposition of capital punishment for the crime of armed robbery. Donaldson v. State, 222 Miss. 715, 76 So.2d 848 (1955). The remaining twenty cases in which the death sentence was affirmed were for the crime of murder. Of that twenty, three involved the murder of an inmate by another inmate at the state penitentiary, two involved the murder of police officers, eight are murders with various aggravating circumstances and most significantly, seven of the cases involved murder in which the aggravating circumstance of robbery or burglary was present. Anderson v. State, 246 Miss. 821, 152 So.2d 702 (1963); Simmons v. State, 241 Miss. 481, 130 So.2d 860 (1961); Thompson v. State, 231 Miss. 624, 97 So.2d 227 (1957); Jones v. State, 228 Miss. 458, 88 So.2d 91 (1956); Keeler v. State, 226 Miss. 199, 84 So.2d 153 (1955); Gilmore v. State, 225 Miss. 173, 82 So.2d 838 (1955); Lewis v. State, 222 Miss. 140, 75 So.2d 448 (1954).
Other cases in which capital punishment was affirmed exhibited the aggravating factor of kidnap and execution style murder, e.g., Gallego v. State, 222 Miss. 719, 77 So.2d 321 (1955); Lewis v. State, 222 Miss. 140, 75 So.2d 448 (1954). It is therefore clear that imposition of the death penalty would not be wanton or arbitrary under the circumstances, based on the survey of prior cases. Nevertheless, given the dates of the cases involved, and the fact that the prior penalties were imposed without full consideration of aggravating and mitigating factors as is now the standard, we elect to reevaluate the consideration of when the death sentence should or should not be imposed.
We note first, as we did in Jackson, that the legislature narrowed the classification of crimes for which the punishment of death could be imposed. In doing so, it selected as one instance the crime of murder where occurring during the commission of armed robbery or kidnapping. We also note that while no death sentences have been affirmed in this Court since 1964, other jurisdictions have recently considered similar cases and have approved the penalty imposed. Richmond v. State, 114 Ariz. 186, 560 P.2d 41 (1976), cert. den'd., 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977) [murder armed robbery]; Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. den'd., 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977) [murder armed robbery]; Harris v. State, 230 S.E.2d 1 (Ga. 1976) [Execution style murder], cert. den'd., 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251 (1977); Floyd v. State, 210 S.E.2d 810 (Ga. 1974), cert. den'd., 431 *1215 U.S. 949, 97 S.Ct. 2667, 53 L.Ed.2d 266 (1977) [murder armed robbery]; Gholson v. State, 542 S.W.2d 395 (Tex. Crim. App. 1976), cert. den'd., 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977) [murder armed robbery].
Based upon the legislative determination as expressed in our capital murder statute, our previous cases where the death penalty was upheld, and a survey of similar cases in other jurisdictions, we cannot say that the punishment here given is disproportionate to the crime committed.
Although not argued as error on appeal, we take note of and have given thorough consideration to certain instructions given by the court. However, after carefully considering the dissatisfaction expressed by some of the Justices with the instructions and reviewing all of the instructions given by the court as a whole, we are unable to say that, although inartfully drawn, instruction No. C.8 found at page 705 of the record, when read in its proper context with instruction No. S-1 found at page 707 of the record could have in any way misled the jury.
Some concern was also expressed in conference with instruction No. S-4 which has often been referred to as the "don't have to know" instruction. It is true that we have held this instruction to be reversible error in a number of cases when the conviction was based upon circumstantial evidence or predominantly circumstantial evidence; however, in this case, the verdict of the jury was not based upon circumstantial evidence. To the contrary, the defendant himself testified to facts or made admissions of facts to a coindictee, who testified to them, that were sufficient to clearly demonstrate Bell's guilt of the crime charged and to warrant the punishment imposed if believed by the jury, which evidently they did.
We also take note that the record does not reflect that the jury was specially sworn as provided by Mississippi Code Annotated section 13-5-73 (1972) to try the case since it involved the death penalty. However, the presumption is that the trial judge properly performed his duties and that this rebuttable presumption has not been overcome. It has also been mentioned that the trial record does not show that the defendant was present throughout the trial, but an examination of the record reveals numerous references to the defendant being present. Moreover, the attorney for the defendant has made no such complaint and again, the presumption is that the trial judge properly performed his duties and saw to it that the defendant was present at each and every material stage of the proceedings.
The four matters discussed above were not urged or argued in the briefs, but the Court has raised them and discussed them of its own motion and, a majority of the Justices are of the opinion that, beyond a reasonable doubt, the verdict would have been the same had these errors not been committed and that the defendant did in fact receive a fair trial.
For the above stated reasons, the case is affirmed and Friday, the seventh day of July, 1978, is set as the date for the execution of the sentence and the infliction of the death penalty in the manner provided by law.
AFFIRMED AND FRIDAY, JULY 7, 1978, IS SET FOR DATE OF EXECUTION OF DEATH SENTENCE.
SMITH, P.J., and SUGG, LEE and BOWLING, JJ., concur.
PATTERSON, C.J., ROBERTSON, P.J., and COFER and BROOM, JJ., dissent.

APPENDIX

MISSISSIPPI CODE ANNOTATED SECTION 97-3-19 (Supp. 1977).
(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(a) When done with deliberate design to effect the death of the person killed, or of any human being;
(b) When done in the commission of an act eminently dangerous to others and *1216 evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;
(c) When done without any design to effect death by any person engaged in the commission of any felony other than rape, kidnapping, burglary, arson or robbery, or in any attempt to commit such felonies.
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purposes of this paragraph, the term "peace officer" means sheriff of counties and their deputies, constables, marshals and policemen of cities and towns, game wardens, parole officers, a judge, prosecuting attorney or any other court official, agents of the alcoholic beverage control division of the state tax commission, agents of the bureau of narcotics, personnel of the Mississippi Highway Patrol, and the superintendent and his deputies, guards, officers and other employees of the Mississippi State Penitentiary;
(b) Murder which is perpetrated by a person who is under sentence of life imprisonment;
(c) Murder which is perpetrated by use or detonation of a bomb or explosive device;
(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals.
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson or robbery, or in any attempt to commit such felonies;
(f) Murder which is perpetrated by the killing of any elected official of a county, municipal, state or federal government with knowledge that the victim was such public official.
BROOM, Justice, dissenting:
Because of the large number of errors (some being errors of a most serious nature) which transpired at the trial of this cause, it cannot be said that the accused was afforded a proper trial. Therefore, I dissent from the majority opinion which in effect applied the "harmless error rule" to the most serious type case known to our jurisprudence: a death penalty case.
Although being unwilling to affirm the death penalty in this case because of errors in the trial, my view is not that the ghastly and grave crime for which Bell was tried and convicted would not justify the death penalty. Indeed, the murder which he perpetrated or helped perpetrate may properly be said to be of sufficient cruelty and malice to be the basis on which to adjudicate that he has forfeited his right to live, but that is not the question before us. All of us are committed to uphold the constitution and laws of this state, including the law that permits infliction of the death penalty in cases such as demonstrated by the facts before us. Nevertheless, even in cases where one commits the most heinous type murder, such a person, although not entitled to a perfect trial, should be afforded a trial free from any substantial or serious error before he is put to death. Although it is well established that in the instant case Bell, the accused, participated in an atrocious killing of another human being, the record of his trial shows two very serious and substantial errors together with a number of lesser errors. The record before us consists of three volumes  some of the proceedings (including the voir dire of jurors) were not placed in the transcript. Court appointed counsel represented the accused.
One instruction told the jurors that if they found that "the defendant was engaged in the criminal act of armed robbery *1217 or kidnapping," they should find Bell guilty of capital murder. Another instruction told the jurors that "you do not have to know that the defendant is guilty" in order to convict him. Both of these errors are of such serious nature that either one of them constitutes reversible error according to prior cases of this Court involving less than the death penalty.
Even though proper argument in behalf of Bell as regards these instructions was not made at trial level or on appeal, I cannot agree to order his execution upon the record before us. There is deeply ingrained in the law of western civilization the requirement that all substantial prerequisites of the law should be adhered to as a predicate to the execution of a human being. Infliction of capital punishment is so awesome and carries with it such utter finality that it should not be exacted where serious substantial errors occur in a trial. Should this man be put to death in spite of the errors we all recognize as occurred in the trial below (they are undenied and obvious), I would have a lingering dissatisfaction because here it cannot be said with confidence that the accused was accorded his fundamental right to trial without serious error. I am unwilling to say that any serious error, where the death penalty is to be inflicted, is "harmless error." Every requirement of the law is meaningful and must have attached to it a certain dignity even where one is on trial for a simple misdemeanor. The apex of our adversary system has to be a case where, as here, the prosecution seeks to have the accused executed  such a case requires at least substantial compliance with established rules.
Referred to already, the first instruction is so patently erroneous and misleading that no authority need be cited to establish its taint. It simply is a bobtailed command that the accused should be found guilty of capital murder once the jurors became convinced beyond a reasonable doubt that he "was engaged in the criminal act of armed robbery or kidnapping." (Emphasis added). It authorized conviction for merely engaging in either of two other offenses and is reversible error. Cutshall v. State, 191 Miss. 764, 4 So.2d 289 (1941). No instruction, however worded, could be more lacking in legality and proper guidance to jurors.
The second instruction referred to, that "you do not have to know that the defendant is guilty" before he may be convicted was condemned and held to be reversible error in a long line of cases, none of which involved the death penalty. Kidd v. State, 258 So.2d 423 (Miss. 1972), a manslaughter conviction; Gilleylen v. State, 255 So.2d 661 (Miss. 1971), a murder case; Kent v. State, 241 So.2d 657 (Miss. 1970), a case of shooting into a dwelling house; Nobles v. State, 241 So.2d 826 (Miss. 1970), a burglary case; Spencer v. State, 240 So.2d 260 (Miss. 1970), a drug abuse case; Pryor v. State, 239 So.2d 911 (Miss. 1970), an armed robbery case; McGill v. State, 235 So.2d 451 (Miss. 1970), a manslaughter case. This Court having heretofore ruled so clearly and recently that any conviction (even for much lesser crimes) where such instruction is given must be set aside, now has fixed an execution in this case in spite of the instruction again having been given. The majority opinion states that our holding this instruction to be reversible error in previous cases was in instances where the conviction "was based upon circumstantial evidence or predominately circumstantial evidence." My perusal of the decisions shows that we have never said in any of them that the taint or defect of "the don't have to know instruction" will be judged according to whether the evidence is "circumstantial or predominantly" so. Indeed, we have held that circumstantial evidence may in certain instances be the strongest of all types of evidence. In its concluding paragraph, the majority opinion states that a "majority of the justices are of the opinion that beyond a reasonable doubt the verdict" would have been the same absent the faulty instructions. On that basis the admittedly erroneous instructions are now in effect approved on the basis of a subjective standard, i.e., opinion of the justices that the jurors were not influenced by faulty instructions.
*1218 We held in McHale v. Daniel, 233 So.2d 764 (Miss. 1970), that an erroneous instruction on a material issue cannot be cured by a proper instruction. The following established principle of the law is found in 1 Reid's Branson Instructions to Juries, § 138 (repl.ed. 1960), at page 399:
A prejudicial instruction cannot be cured by a correct instruction which does not call the jury's attention to the prejudicial instruction.
It is to be noted that neither of the erroneous instructions under discussion was corrected by another instruction which called to the jury's attention the prejudicial instruction. True enough, other instructions given the jury were correct and arguably could be said to have adequately and properly instructed the jury except for the two grossly erroneous instructions which were not corrected by any other instruction directing to the jury's attention either of the two prejudicial instructions. Indeed the very content of the two instructions would render their correction impossible by other instructions.
There are other, lesser, errors in this record. Neither the order of conviction or anything else in the record shows that the jury which convicted Bell was even sworn at all, much less that they were specially sworn. This is true even though Mississippi Code Ann. § 13-5-73 (1972), dealing with cases which carry the death penalty, requires a special oath be given jurors in a case of this type. The record is also deficient by its failure to show that the defendant was present throughout the trial. On either one of these errors noted in this paragraph, standing alone, I would not suggest reversal. My view is that we must, in a case where the death penalty is at issue, carefully consider the entire record and the sum total of every deficiency. Ignominious to the defendant, though possibly good news to citizenry untrained in the law, is the infliction of the death penalty in a case so brutal as this. Nevertheless, we must see that even the most vile, wretched and hardened of all criminals is given a trial, sentence, and judgment in which he is accorded an appropriate measure of decorum together with adherence to established precedents which cover the law with rectitude and respect. The majority opinion has injected a most peculiar and novel holding into our jurisprudence. Previous requirements of the content of jury instructions have been relaxed in the most serious of all cases (death penalty), by invoking a subjective standard, i.e., how much attention the justices think the jurors paid to faulty jury instructions. Should execution of an accused depend upon how this Court second guesses twelve jurors' reaction to or application of fundamentally erroneous instructions? The more prudent and judicious answer is: It should not.
In a case where criminal conviction carries with it the death penalty, the requirements of due process include jury instructions not previously held to be reversible error. No suggestion is made here that Bell be exonerated or acquitted but, in view of the two serious errors (faulty jury instructions) pointed out which must be considered along with other lesser errors, it cannot be said that he was properly and fairly tried. Under these circumstances, he should be tried by another jury.
PATTERSON, C.J., ROBERTSON, P.J., and COFER, J., join in this dissent.
NOTES
[1] As part of his assignments of error, Bell argues that the construction given the capital murder statute in Jackson was unconstitutional as a violation of separation of powers and that the statute as applied to him through the Jackson decision constitutes a violation of the prohibition against ex post facto laws. Both issues were argued and resolved adversely to Bell in a previous case, Bell v. State, 353 So.2d 1141, 1143 (Miss. 1977).
[2] There was conflict in the testimony as to whether Bell was seventeen or eighteen years of age.